UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CRATER CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:98CV00913 ERW |
| | ) | |
| LUCENT TECHNOLOGIES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND OPINION**

This matter comes before the Court on Defendants' Lucent Technologies, Inc. and AT&T

Co.'s Motion for Summary Judgment [doc. #289].

I.      **PROCEDURAL BACKGROUND**

Crater Corporation ("Plaintiff") sued Lucent Technologies, Inc. and AT&T Co.

("Defendants") in this Court, alleging that Lucent infringed Plaintiff's U.S. Patent No. 5,286,129,

a patent directed to an underwater coupling device.  Plaintiff also asserted state law claims against

Defendants for misappropriation of trade secrets and breach of contract.  This Court dismissed

Plaintiff's patent infringement claims and the state law claims.  *See Crater Corp. v. Lucent*

*Technologies, Inc.*, 1999 WL 33973795 (E.D. Mo. Aug. 25, 1999).  On appeal, the dismissal of

the patent claims was affirmed, but the dismissal of the state law claims was vacated and the

matter remanded.  *Crater Corp. v. Lucent Technologies, Inc.*, 255 F.3d 1361

(Fed. Cir. 2001).  On remand, the Court determined that the government's proper assertion of the

military and state secrets privilege made it impossible for Plaintiff to engage in discovery or to

make out a prima facie case of misappropriation of trade secrets or breach of contract and also

inhibited Defendants in defending against Plaintiff's claims.  *Crater Corp. v. Lucent Technologies,*

*Inc.*, 2004 WL 3609347 (E.D. Mo. Feb. 19, 2004). On this basis, the Court dismissed Plaintiff's state law claims. *See id.*

Plaintiff appealed the dismissal of its state law claims, and the United States Court of Appeals for the Federal Circuit determined that the Court did not error in sustaining the government's assertion of the state secrets privilege, but that the Court did error in dismissing Plaintiff's state law claims. *Crater Corp. v. Lucent Technologies, Inc.*, 423 F.3d 1260 (Fed. Cir. 2005). The Federal Circuit determined that further proceedings were required because the record in the case was not sufficiently developed to enable a determination of the effect of the government's assertion of privilege on the state law claims. *Id.*

The Federal Circuit remanded this suit, and has directed that the Court determine the precise nature of Plaintiff's state law claims in six specific areas:

(i) the precise trade secrets that exist in connection with the Crater coupler;
(ii) which of those trade secrets [Plaintiff] alleges were misappropriated;
(iii) whether a contract existed between [Plaintiff] and [Defendants];
(iv) if a contract did exist, its terms;
(v) which of the contract's terms [Plaintiff] alleges were breached; and
(vi) what constituted the alleged breach.

*Id.* The Federal Circuit stated that on remand, after the Court determines the precise nature of Plaintiff's state law claims, the Court should determine "which, if any, of the documents sought in discovery may be produced in the face of the government's assertion of the state secrets privilege." *Id.* at 1269.

Following remand, on August 31, 2006, Plaintiff filed a Second Amended Complaint, and Defendants responded on September 20, 2006. In Plaintiff's Second Amended Complaint, Counts 3, 4, and 6 allege claims resulting from Patent Infringement. These claims are identical to those in the Plaintiff's First Amended Complaint [doc. #21]. These claims were dismissed from Plaintiff's First Amended Complaint in an order dated August 25, 1999 [doc. #140], and this

2

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

dismissal was upheld by the Federal Circuit. As a result, the Court dismissed Counts 3, 4, and 6 from Plaintiff's Second Amended Complaint in an order dated November 29, 2006 [doc. # 282].

Defendants' filed a motion for summary judgment [doc. #289] on April 16, 2007, seeking a grant of summary judgment on Counts 1, 2 and 5 of Plaintiff's Second Amended Complaint. This motion is pending before the Court. In order for the Court to comply with the Federal Circuit's opinion, it is necessary to determine at this juncture whether the Plaintiff has provided sufficient evidence in support of its prima facie case, and subsequently, for this Court to determine whether proof of those specific issues will require documentation protected by the state secrets privilege.

## II.    BACKGROUND FACTS[1]

Phil French, Charles Monty and Steven Van Keuren ("Crater Principals") developed the technology underlying the Crater Coupler in the late 1980's. The Crater Coupler is a connector for fiber optics. The Crater Principals never signed an agreement among themselves to keep this technology confidential. Throughout the early development of this device, Plaintiff failed to protect its alleged confidentiality. For example, in 1988, Phil French worked with a machinist to develop a prototype of the Crater Coupler without extracting promises of confidentiality. When Plaintiff began sharing this technology with various companies in the years before Plaintiff received its patent, Plaintiff regularly sent out information concerning the technology with an

---

[1] The Court's recitation of the facts is taken from Defendants' Statement of Uncontroverted Material Facts, Plaintiff's Response to the Statement of Uncontroverted Material Facts, Plaintiff's Statement of Disputed Issues of Material Fact, and Defendants' Response to Plaintiff's Local Rule 7-4.01(E) Statements.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

unsigned nondisclosure agreement.  The solicited company was free to look at the technology without signing the agreement.[2]

Plaintiff applied for a patent on August 7, 1991.  U.S. Patent No. 5,286,129, was issued to Plaintiff on February 15, 1994.  Plaintiff sent out more solicitations after the patent was issued, but dispensed with the non-disclosure agreement since it now had patent protection for the Coupler.  Plaintiff felt that this information did not need to be kept confidential because it was protected by the patent.  In February of 1994, Plaintiff sent about 43 solicitations to various companies in an attempt to license the Coupler.  Plaintiff received less than 10 responses, and the only response that seemed promising was a response from Plast-O-Matic.  Plaintiff prepared a nondisclosure agreement for Plast-O-Matic to sign, and sent this agreement with its solicitation package to Plast-O-Matic, but this one was sent before Plaintiff's patent issued.  However, Plast-O-Matic responded to Plaintiff after the patent issued.  Plaintiff does not know if a nondisclosure agreement was ever signed by Plast-O-Matic.

Plaintiff's solicitation packages to other third parties emphasized that since its Coupler was patented, detailed drawings and videos of the Coupler were not confidential.  When Plast-O-Matic passed Plaintiff's drawings along to Defendants, Plast-O-Matic indicated that confidential markings on the drawings could be ignored because the technology now had patent protection. Plast-O-Matic's indication that any confidential markings on drawings could be ignored was consistent with Plaintiff's belief that it need not "worry about confidentiality because the device is

_____

[2] Plaintiff has denied the statements in this paragraph, and cites to French Depo. pp. 176-178, Monty Declaration ¶ 8, and French Declaration ¶ 26 in support of this denial.  The Court has reviewed these sections, and has found no information that contradicts the information in this paragraph.  These facts are not in controversy.

4

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

now patented." None of the documents that Plaintiff later shared directly with Defendants were marked confidential.

The Crater Principals had weekly meetings for years to discuss their attempts to license their technology, and they took copious notes at these meetings. None of the detailed notes from any of the Crater Principals during Plaintiff's work with Defendants - including notes from the initial March 17, 1995 meeting with Defendants - indicate that Plaintiff and Defendant ever agreed on anything or that Defendants were informed that anything was confidential.[3]

Defendants were developing an underwater fiber optic wetmate for the federal government on a classified Naval project. An underwater fiber optic wetmate essentially is a device that connects and disconnects fiber optics beneath the sea. Defendants approached Plast-O-Matic, along with other companies, to develop connector technology for the wetmate. Plaintiff did not have a "pre-made coupler ready to go" for the application in which it believed Defendants were ultimately interested. Indeed, Plaintiff had no actual Crater Couplers in commercial use before it began its work with Defendants, did not have the capacity to manufacture and sell Couplers, had no signed license agreements for the Coupler and had no customers. Plaintiff was "developing the coupler while it was working with [Defendants]."

Before 1995, Plaintiff had never "attempted to connect a fiberoptic carrier through a Crater coupler," never "attempted to connect its coupler under the sea," and never "attempted to connect its coupler under conditions that were intended to simulate undersea conditions." Plaintiff had never tested the "use of its coupling device within a larger device" such as the wetmate that was the end goal of the Government project. Plaintiff's only experience testing the

---

[3] Plaintiff disputes this fact, and directs the Court to four exhibits which contain over 300 pages, most of which are handwritten. In the absence of a direct page citation to a discussion regarding confidentiality, the Court does not find this fact to be in controversy.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Coupler in underwater conditions consisted of putting the Coupler in the "kitchen sink." The application in which Plaintiff believed Defendants were ultimately interested was "not an application that Plaintiff had previously spent a lot of time and analysis thinking about or testing."

In January 1995, Plaintiff asked Plast-O-Matic to identify its customer. On February 7, 1995, Plast-O-Matic prepared a memorandum of understanding that it requested Plaintiff sign before it disclosed its customer. Plaintiff sent a signed agreement consistent with Plast-O-Matic's terms on February 16, 1995. On February 17, 1995, Plast-O-Matic disclosed that it was working with Defendants and thereafter Plaintiff and Defendants began working directly with each other. Plaintiff, Defendants, and Plast-O-Matic first had a joint meeting on March 17, 1995, where they discussed a number of issues relating to the project. Plaintiff cannot say for certain who was at the meeting on March 17, 1995, and in his deposition, Phil French could not recall if Defendants said anything about confidentiality at that meeting.[4] Charles Monty also could not recall who specifically agreed that Defendants would keep information confidential. Plaintiff's contemporaneous notes of that meeting do not reflect that any contract or agreement was made during that meeting or that there was any discussion of confidentiality. The parties never signed a written agreement.

After the March 1995 meeting, Defendants requested that Plaintiff have a prototype of its Coupler manufactured, and Defendants paid Plaintiff for this prototype.[5] Defendants collaborated with Plaintiff in suggesting the features that should be included in this prototype. Plaintiff and

---

[4] However, when he was later examined by his own attorney, Phil French testified that everyone came to an agreement on confidentiality.

[5] Plaintiff denies this statement of fact, and relies on the Second Declaration of Charles Monty. The Court reviewed this declaration, and found that the statements on which Plaintiff relies do not relate to this prototype, but rather a prototype that was requested and paid for by Plast-O-Matic.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Defendants "exchanged ideas back and forth on how to solve the various problems … and issues that [Defendants] wanted to tackle." On May 25, 1995, Phil French wrote to Defendants and forwarded the prototype engineering drawings on the condition that "[i]t is understood that these drawings are provided on the express condition that they are to be used as information to assist in further R&D at your factory, but not used for production or sale of any Crater related Q/D product until the appropriate license agreement has been executed." Defendants did not respond to or otherwise acknowledge this letter, but did utilize the drawings provided by Plaintiff.

Notwithstanding this letter, Defendants contracted with Unique Tool, an independent corporation, for the production of some of the Crater Couplers. Plaintiff also became aware at this point that Defendant would be doing some of the manufacturing for the project through third party subcontractors, but Plaintiff never sought confidentiality agreements with those subcontractors. Plaintiff never complained about Defendants' use of subcontractors because it did not matter whether Defendants "[made] them in-house or [used] a contractor to do it, just as long as [Defendants] selected [Plaintiff's] device and [Plaintiff] got a license agreement."[6] In early 1995, Plaintiff prepared a prototype at a machine shop in Maine based on the same engineering drawings it now alleges were trade secrets, but did not know if individuals at that shop signed a confidentiality agreement.[7]

---

[6] Plaintiff denies this fact, but does not provide the Court with any citations to the record to support this denial.

[7] Plaintiff denies this statement, and as support references the Second Declaration of Chuck Monty. This second declaration appears to the Court to be an attempt by Plaintiff to create a triable issue by submitting an affidavit that contradicts earlier deposition testimony. This does not create an issue of disputed fact. *See Marathon Ashland Petroleum, LLC. v. Intern. Broth. of Teamsters*, 300 F.3d 945, 951 (8th Cir. 2002); *Am. Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 111 (8th Cir. 1997).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiff was informed by Defendants that its design was competing with other connector technology, and that Defendants expected to have a critical design review before the end of the year and a final decision by April, May, or June of 1996. Plaintiff was aware that there were two other candidates competing for the classified work. Plaintiff also became aware that the project was under a United States Government contract during the "first third" or "first quarter" of the relationship, and that this project was classified. Despite this knowledge, Plaintiff continued to provide information and drawings to Defendants for the project.

Plaintiff's ultimate goal was a license agreement with Defendants. Plaintiff shared information and technology with Defendants and did not insist on complete payments for time and energy expended. Plaintiff was aware of the risk that Defendants might not select their design for the Government project and that its work might not result in a license agreement.[8] Plaintiff understood that "until such time as the Crater design was selected, that [Defendants] did not want to enter a license agreement." In the end, Defendants did not make any production devices for sale, incorporating Plaintiff's Coupler, and did not sell any devices incorporating the Crater Coupler.[9]

In October 1995, Plaintiff requested that Defendants provide a disk with copies of various drawings that Defendants had done. However, no one employed by Plaintiff had a security clearance. Plaintiff understood that the work for the United States Government was classified,

---

[8] While Plaintiff admits this is true, they state that they were not aware of the risk of Defendants breaching their agreements with Plaintiff and using Plaintiff's information for sales.

[9] Plaintiff denies this statement and cites to the Nagengast Deposition at pages 17 and 43-44 and the Rominski Deposition at pages 45-46. The Court has reviewed these pages and does not find that the deposition testimony presents a genuine issue of material fact over wether Defendants ever used the Crater Coupler for anything more than research and development or sold the Crater Coupler without a license agreement. This is discussed in more detail in the discussion sections for "Agreement 1" and "Misappropriation of Trade Secrets."

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

and that "without a security clearance, [Plaintiff] would not be entitled to any classified information."  Defendants did not provide Crater with the drawings, test plans, and computer CAD information for any Crater Couplers Defendants' made.

As of February 1996, Plaintiff told Defendants that was concerned that the development process could go on for another year.  Nonetheless, Plaintiff and Defendants continued to negotiate the terms of a license agreement in the event Plaintiff's technology was selected for use in the government's project.  On August 1, 1996, Plaintiff made an offer for a license agreement with a one-time up front fee of $1.2 million, which Defendants rejected.  Plaintiff counter offered to settle the parties' claims for $120,000 on September 24, 1996.  Defendants countered with an offer of $100,000 on January 22, 1997.  After Plaintiff changed their demand to $400,000, the parties continued negotiations but never agreed on a license.  Plaintiff was willing to invest its time in the collaboration with Defendants "as part of an effort to get [Defendants] to license the patent."  Plaintiff's strategy was "short term buy-in hoping to recoup in the long term with [a] license agreement."  However, Plaintiff never received a license agreement from Defendants.  Phil French expressed in writing that Plaintiff "willingly took this gamble and lost" and "chalked it up to a bad break."[10]

Plaintiff was informed that any alleged patent infringement claim would have to be pursued against the United States, and on November 15, 1996, Plaintiff filed an administrative claim with the United States seeking recovery for patent infringement and requesting compensation.  Plaintiff's administrative claim with the United States remains pending.  The United States has confirmed that Defendants made 36 "brassboard/prototype engineering

---

[10]  While Plaintiff admits this is true, they state that they were not aware of the risk of Defendants breaching their agreements with Plaintiff and using Plaintiff's information for sales.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

development unit coupling devices" for research and development and adds that the United States decided not to use those devices and has no intention of using them in the future.[11]

## III.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (*quoting* Fed. R. Civ. P. 1).  "By its very terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one "such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322-23.

---

[11] Plaintiff admits this fact, but states that it is hearsay and unauthenticated.  Plaintiff also states that Defendants have admitted to making 53 units.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish "the non-existence of any genuine issue of fact that is material to a judgment in his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 256-57. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). To meet its burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the non-moving party must show there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.*

IV.    DISCUSSION

A.      CHOICE OF LAW

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

In their opinion remanding this case, the Federal Circuit assumed that Missouri law applied to Plaintiff's claims. *See Crater Corp*, 423 F.3d at 1268. This assumption is incorrect. To determine which state's law governs Plaintiff's claim of breach of contract (a contract claim) and Plaintiff's claim of misappropriation of a trade secret (a tort claim), the Court must apply the choice of law rules of Missouri, as Missouri is the forum state. *See Surgical Synergies, Inc. v. Genesee Associates, Inc.*, 432 F.3d 870, 873-74 (8th Cir. 2005). Missouri choice of law rules require courts to "apply the "most significant relationship" test set out in Section 188 of the Restatement (Second) of Conflict of Laws." *Dillard v. Shaughnessy, Fickel and Scott Architects, Inc.*, 943 S.W.2d 711, 715 (Mo. Ct. App. 1997); *see also Highwoods Props., Inc. v. Executive Risk Indem., Inc.*, 407 F.3d 917, 920 (8th Cir. 2005). "This test requires a balancing of several factors to determine which state has the most significant relationship to the action." *Superior Equip. Co. v. Md. Cas. Co.*, 986 S.W.2d 477, 480 (Mo. Ct. App. 1998). Depending upon whether the claim sounds in contract or tort law, different factors will be utilized to determine the most significant relationship.

When considering a contract claim, the factors to be considered by the Court are "(a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* These factors are evaluated "based on their relative importance to the particular issue before the court." *Dillard*, 943 S.W.2d at 715. "Different factors may be entitled to more weight" depending upon "their relative importance to the particular issue before the court." *Id.*

Here, the balance of factors for the contract claim favors New Jersey. The alleged contract was executed in Cedar Grove, New Jersey, and was to be performed in Whippany, New

Jersey. Additionally, the subject matter of the alleged contract was in Whippany, New Jersey. When the parties were working together, they were both Delaware corporations. This is the only factor that does not favor the application of New Jersey Law. However, the balance of the factors indicates that New Jersey law should be applied to Plaintiff's breach of contract claim.

When considering a tort claim, such as Plaintiff's claim for the misappropriation of trade secrets, the factors that must be considered are: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (3) the place where the relationship, if any, between the parties is centered." *Stricker v. Union Planters Bank, N.A.*, 436 F.3d 875, 878 (8th Cir. 2006) (*quoting* Restatement (Second) of Conflict of Laws § 145 (1971)).

The misappropriation which allegedly caused Plaintiff's injury occurred in New Jersey. Defendants' offices at the time were in New Jersey and the parties' relationship was centered around activity at Defendants' factory in Whippany, New Jersey. When the parties were working together, they were both Delaware corporations, and accordingly, this factor does not favor New Jersey. The balance of these factors requires the Court to apply New Jersey law to Plaintiff's claim of misappropriation of trade secrets.

## B. BREACH OF CONTRACT

Under New Jersey law, a plaintiff may recover for breach of contract if they establish "that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007). The Federal Circuit specifically remanded Plaintiff's claim for breach of contract for the Court to determine, "(iii) whether a contract existed between

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

[Plaintiff] and [Defendants]; (iv) if a contract did exist, its terms; (v) which of the contract's terms [Plaintiff] alleges were breached; and (vi) what constituted the alleged breach."

The answer to (v) is readily apparent as Plaintiff specifically alleges four different agreements that were breached:

1. That Defendants would only use the Crater Coupler for research and development not sell any wetmates including a Crater Coupler without a license agreement.
2. That Defendants would provide Plaintiff with physical drawings, computer CAD/CAM drawings and test results for Crater Couplers developed by Defendants.
3. That Defendants would not disclose information and design knowledge to anyone else, and would only use such information and design knowledge internally.
4. That Defendants would only make Crater Couplers at its facility in Whippany, New Jersey.

The Court will review each of these purported agreements to determine if there was a contract and whether it was breached. The Court must determine whether "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Celotex Corp.*, 477 U.S. at 322.

**Agreement 1: That Defendants would only use the Crater Coupler for research and development not sell any wetmates including a Crater Coupler without a license agreement.**

Plaintiff alleges that Defendants agreed to use the Crater Coupler only for research and development, and agreed not sell any wetmates, including a Crater Coupler, without a license agreement. The only evidence of an agreement Plaintiff has submitted on this point is a letter sent by Plaintiff to Defendants in 1995. This letter contained various drawings and stated that "[i]t is understood that these drawings are provided on the express condition that they are to be used as information to assist in further R&D at your factory, but not used for production or sale of any

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Crater related Q/D product until the appropriate license agreement has been executed."[12]  Plaintiff

has not submitted any information that Defendants responded to this letter or acknowledged the

letter in any way.

It is well established that silence or inaction generally will not constitute an acceptance of

an offer.  *Beach v. U.S.*, 226 U.S. 243 (1912).  However, silence will operate as an acceptance

"Where an offeree takes the benefit of offered services with reasonable opportunity to reject them

and reason to know that they were offered with the expectation of compensation."  Restatement

(Second) of Contracts § 69; *Fiest & Fiest Realty Corp. v. Dockside Urban Renewal Corp.*, 604

A.2d 653, 656 (N.J. Super. Ct. Law Div. 1992).  Accordingly, there may have been a contract

between Plaintiff and Defendants.

However, even assuming that there was a contract between Plaintiff and Defendants, this

claim fails to state a prima facie case as Plaintiff's have not submitted facts demonstrating that a

breach occurred.  In Defendant's Statement of Uncontroverted Material Facts, ¶ 70 states

"[Defendants] did not make any production devices incorporating [Plaintiff's] technology for sale

and did not sell any devices incorporating that technology."  Plaintiff denies this statement and

cites to the Nagengast Deposition at pages 17 and 43-44 and the Rominski Deposition at pages

45-46.  The Court has reviewed these pages and does not find that the deposition testimony

presents a genuine issue of material fact over whether Defendants ever used the Crater Coupler

for anything more than research and development or produced or sold the Crater Coupler without

a license agreement.

---

[12] The parties have not defined this term, but the Court understands Q/D to stand for
"quick disconnect."

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Mr. Nagengast testified that the "responsibility for manufacturing that component was moved to North Carolina. That's not to say that the actual manufacture was moved of that component." While Mr. Nagengast did confirm that "all of" the Couplers that were made by Defendants were sold to the government, immediately before that comment, he stated that he was not drawing a distinction between a device made in a lab to perfect a design (research and development), and a device actually sold to a customer. In the referenced pages of Mr. Rominski's deposition, he testifies to the ten to fifteen Crater Couplers that were made under his authority and states that Unique Tool also produced some Crater Couplers. Mr. Rominski does not state that any Crater Couplers were ever manufactured for sale.

The testimony of Mr. Nagengast and Mr. Rominski does not demonstrate that Defendants used the Crater Coupler for anything more than research and development. Even assuming that there was a contract, there is no evidence that it was breached by Defendants. Plaintiff, as the non-moving party, must show there is sufficient evidence which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334. The evidence detailed above is not sufficient for a jury to find that Defendants ever used the Crater Coupler for anything more than research and development or sold the Crater Coupler without a license agreement. Accordingly, Plaintiff has failed to state a prima facie claim for breach of contract on this alleged agreement.

### Agreement 2: That Defendants would provide Plaintiff with physical drawings, computer CAD/CAM drawings and test results for Crater Couplers developed by Defendants.

The second agreement Plaintiff claims existed is that Defendants agreed to provide Plaintiff with physical drawings, computer CAD/CAM drawings and test results for Crater Couplers developed by Defendants. Phil French testified that Plaintiff asked for the drawings and

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

test results, and that Paul Rominski told him that Defendants would provide what they had. This alleged agreement took place on October 25, 1995, which is *after* Plaintiff had already disclosed its information and technology. Plaintiff has introduced no evidence of any independent consideration for this agreement.

Where no consideration exists, the lack of consideration will result in no contract being formed unless some substitute for consideration, such as a seal, is present. *Minch v. Saymon*, 233 A.2d 385 (N.J. Super. Ct. Ch. Div. 1967). Just as Plaintiff has not introduced any evidence of consideration, Plaintiff has not presented any evidence of the existence of a consideration substitute. Plaintiff, as the non-moving party, must show there is sufficient evidence which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334. The evidence detailed above is not sufficient for a jury to find that a contract existed between Plaintiff and Defendants. Accordingly, Plaintiff has failed to state a prima facie claim that a contract existed between Plaintiff and Defendants as a result of this promise.

**Agreement 3: That Defendants would not disclose information and design knowledge to anyone else, and would only use this information internally.**

Plaintiff has submitted a letter sent by Plaintiff to Defendants in 1995. This letter contained various drawings and states that "[i]t is understood that these drawings are provided on the express condition that they are to be used as information to assist in further R&D at your factory . . ." Plaintiff asserts that this letter formed a contract and that Defendants breached this contract when they disclosed information and design knowledge to Unique Tool, an independent company who was contracted by Defendants to manufacture Crater Couplers. Plaintiff also alleges that this contract was breached when Defendants sold the Advanced Technology Systems

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

division, the division that physically had the Crater Couplers, to General Dynamics, asserting that General Dynamics acquired this information and design knowledge in this sale.

Plaintiff has not submitted any information that Defendants responded to this letter or acknowledged the wording in the letter.  It is well established that silence or inaction generally will not constitute an acceptance of an offer.  *Beach*, 226 U.S. 243.  However, silence will operate as an acceptance "Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation."  Restatement (Second) of Contracts § 69; *Fiest & Fiest Realty Corp.*, 604 A.2d at 656.  Accordingly, there may have been a contract between Plaintiff and Defendants.

Plaintiff's claim of breach of contract due to the disclosure of information and design knowledge to Unique Tool will survive Defendants' Motion for Summary Judgment.  Based on the evidence submitted by the parties, it appears to the Court that Plaintiff has waived its right to claim for damages resulting from Defendants' contract with Unique Tool for the manufacture of Crater Couplers.  Waiver will bar the enforcement of a contract term when "a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach."  *Garden State Bldgs. v. First Fidelity Bank*, 702 A.2d 1315, 1323 (N.J. Super. Ct. App. Div. 1997).  When this happens, a party "may be deemed to have acquiesced in an alteration of the terms of the contract."  *Id.*

In his deposition, Phil French stated that Plaintiff did not complain about Defendants' use of subcontractors because it did not matter to it whether Defendants "[made] them in-house or [used] a contractor to do it, just as long as [Defendants] selected [Plaintiff's] device and [Plaintiff] got a license agreement."  This indicates that Plaintiff may have acquiesced to the alteration of this contract term.  However, waiver is a defense that involves a party's state of mind, and under New

Jersey law, this defense "should not be decided on a summary judgment basis." *Id.* at 527.

Plaintiff has submitted sufficient evidence for a jury to find that a contract existed between

Plaintiff and Defendants, and that Defendants breached this contract by disclosing information and

design knowledge to Unique Tool.

However, Plaintiff's claim resulting from the sale of the Advanced Technology Systems

division to General Dynamics fails, as Plaintiff has not shown that Defendants breached this

alleged agreement. As discussed above, Plaintiff has submitted sufficient evidence for a jury to

find that a contract existed, and that Defendants had agreed not to disclose information and design

knowledge. However, Plaintiff has not introduced any evidence that such an agreement was

breached. The section of Mr. Nagengast's deposition on which Plaintiff relies merely states that

the Advanced Technology Systems division was sold to General Dynamics. The fact that a

division of a company was sold is not, in and of itself, sufficient for a finding that any technology

on which that division worked prior to the sale was transferred during the sale. The evidence

detailed above is not sufficient for a jury to find that Defendants disclosed information and design

knowledge to General Dynamics. Accordingly, Plaintiff has failed to state a prima facie claim for

breach of contract on this alleged agreement.

### Agreement 4: That Defendants would only make Crater Couplers at its facility in Whippany, New Jersey.

Finally, Plaintiff asserts that Defendants agreed to only make Crater Couplers at its facility

in Whippany, New Jersey. This alleged agreement results from the same letter sent by Plaintiff to

Defendants in 1995 that forms the basis for Agreements 1 and 3. This letter contained various

drawings and stated that "[i]t is understood that these drawings are provided on the express

condition that they are to be used as information to assist in further R&D at your factory . . ."

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiff has not submitted any information that Defendants responded to this letter or acknowledged the wording in the letter, but, as discussed above, Plaintiff has submitted sufficient evidence for a jury to find that a contract existed between Plaintiff and Defendants based upon this letter. Plaintiff has also submitted evidence that Defendants contracted with Unique Tool for the manufacture of several Crater Couplers, and this evidence is sufficient to enable a jury to return a verdict for Plaintiff.

Plaintiff's claim of breach of contract due to the manufacture of Crater Couplers by Unique Tool will survive Defendants' Motion for Summary Judgment. However, the Court notes that it appears as though Plaintiff has waived their right to claim for damages resulting from this breach. Waiver will bar the enforcement of a contract term when "a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach." *Garden State Bldgs.*, 702 A.2d at 1323. When this happens, a party "may be deemed to have acquiesced in an alteration of the terms of the contract." *Id.*

In his deposition, Phil French stated that Plaintiff did not complain about Defendants' use of subcontractors because it did not matter to it whether Defendants "[made] them in-house or using a contractor to do it, just as long as [Defendants] selected [Plaintiff's] device and [Plaintiff] got a license agreement." This indicates that Plaintiff may have acquiesced to the alteration of this contract term. However, waiver is a defense that involves a party's state of mind, and under New Jersey law, this defense "should not be decided on a summary judgment basis." *Id.* at 527. Plaintiff has submitted sufficient evidence for a jury to find that a contract existed between Plaintiff and Defendants, and that Defendants breached this contract by subcontracting with Unique Tool for the production of Crater Couplers.

**C.      MISAPPROPRIATION OF TRADE SECRETS**

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

In Plaintiff's Second Amended Complaint, filed on August 31, 2007, Counts 2 and 5 are entitled "Misappropriation of Trade Secrets." However, in their brief in opposition to summary judgment, they instead seek to recover for the tort of "Submission of Ideas." To recover under this theory, "plaintiff is required to establish as a prerequisite to relief that (1) the idea was novel; (2) it was made in confidence, and (3) it was adopted and made use of." *Johnson v. Benjamin Moore & Co.*, 788 A.2d 906, 914 (N.J. Super. Ct. App. Div. 2002) (internal citations omitted). The elements of this tort are different than those required to recover for the misappropriation of trade secrets. The elements for a claim of misappropriation of trade secrets are as follows:

(1) a trade secret exists;
(2) the information comprising the trade secret was communicated in confidence by plaintiff to the employee;
(3) the secret information was disclosed by that employee and in breach of that confidence;
(4) the secret information was acquired by a competitor with knowledge of the employee's breach of confidence;
(5) the secret information was used by the competitor to the detriment of plaintiff; and
(6) the plaintiff took precautions to maintain the secrecy of the trade secret.

*Rycoline Products, Inc. v. Walsh*, 756 A.2d 1047, 1052 (N.J. Super. Ct. App. Div. 2000).

Plaintiff is correct that this claim falls under the category of submission of an idea rather than the misappropriation of a trade secret. "Whether the discoverer is a user or merely a discloser of an idea . . . determines whether protection is accorded under trade secret principles or those which apply to the submission of an idea." 1-1 Milgrim on Trade Secrets § 1.02. "When trade secret claims do not meet the Restatement's 'use in business' requirement, they are treated as submission-of-idea cases." 49 New Jersey Practice, Business Law Deskbook § 15:4 (Brent A. Olson, et al.) (2007 ed.). Even though Counts 2 and 5 were captioned "Misappropriation of Trade Secrets" they will be analyzed as claims based on the tort of submission of ideas.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

As stated above, a plaintiff must show "(1) the idea was novel; (2) it was made in confidence, and (3) it was adopted and made use of." *Johnson*, 788 A.2d at 914.[13] The parties dispute whether any of Plaintiff's ideas were novel and whether the ideas were communicated to Defendants in confidence. However, the Court need not determine whether Plaintiff has presented evidence to establish their prima facie claim on these two elements as it is clear that Plaintiff cannot establish the third element of this tort.

To recover from Defendants on Plaintiff's claim for submission of ideas, Plaintiff must prove that the Crater Coupler was "adopted and made use of [by the defendant[s] in connection with [their] own activities]." *Baer v. Chase*, 392 F.3d 609, 627 (3rd Cir. 2004). Plaintiff alleges that Defendants' use of Plaintiff's idea for research and development is sufficient for Plaintiff to recover under this theory. However, a review of the relevant case law demonstrates that more than research and development is necessary; the Crater Coupler must have been available for sale on the open market. *See, e.g., Johnson*, 788 A.2d 906; *Duffy v. Charles Schwab & Co.*, 123 F. Supp 2d 802 (D.N.J. 2000).

As previously discussed, Plaintiff has introduced no evidence that the Crater Coupler was sold on the open market. In Defendant's Statement of Uncontroverted Material Facts, ¶ 70 states that "[Defendants] did not make any production devices incorporating [Plaintiff's] technology for sale and did not sell any devices incorporating that technology." Plaintiff denies this statement and cites to the Nagengast Deposition at pages 17 and 43-44 and the Rominski Deposition at pages 45-46. The Court has reviewed these pages and does not find that the deposition testimony

---

[13] The Federal Circuit remanded this dispute and instructed the Court to determine "(i) the precise trade secrets that exist in connection with the Crater Coupler; [and] (ii) which of those trade secrets [Plaintiff] alleges were misappropriated." *Crater Corp.*, 423 F.3d at 1268. The instructions given by the Federal Circuit are intended to be applied to a claim for the misappropriation of trade secrets, not a claim based on submission of ideas.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

presents a genuine issue of material fact over whether Defendants ever used the Crater Coupler for anything more than research and development or sold the Crater Coupler without a license agreement.

Mr. Nagengast testified that the "responsibility for manufacturing that component was moved to North Carolina. That's not to say that the actual manufacture was moved of that component." Mr. Nagengast did confirm that "all of" the Couplers that were made by Defendants were sold to the government. However, immediately before that comment he stated that he was not drawing a distinction between a device made in a lab to perfect a design (research and development), and a device actually sold to a customer. In the referenced pages of Mr. Rominski's deposition, he testifies that ten to fifteen Crater Couplers were made under his authority and that Unique Tool also produced Crater Couplers. These depositions do not demonstrate that Defendants ever manufactured Crater Couplers for sale on the open market.

The testimony of Mr. Nagengast and Mr. Rominski fails to create an issue of material fact over whether Defendants used the Crater Coupler for more than research and development. Plaintiff, as the non-moving party, must show there is sufficient evidence which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334. Plaintiff has failed to produce sufficient evidence for a jury to find that the Crater Coupler was "adopted and made use of." *Johnson*, 788 A.2d at 914. Accordingly, Plaintiff has failed to state a prima facie claim for submission of ideas.

## V.        CONCLUSION

Plaintiff has failed to provide facts to establish a prima facie claim or to establish that an alleged agreement was breached for many of its claims. However, Plaintiff has introduced sufficient facts to establish a prima facie claim for breach of contract based on the alleged

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

agreements that Defendants would only make Crater Couplers at its facility in Whippany, New Jersey and that Defendants would not disclose information and design knowledge.

Where the state secrets privilege is invoked, there are three instances in which the case may not continue: (1) if state secrets are critical to the resolution of core factual questions in the case; (2) if the plaintiff's ability to prove its case necessarily depends on or threatens the disclosure of privileged information; or (3) where the invocation of the privilege deprives the defendant of a valid defense. *See D.T.M. Research, LLC v. AT & T Corp.*, 245 F.3d 327, 334 (4th Cir. 2001); *Kasza v. Browner*, 33 F.3d 1159, 1166 (9th Cir. 1998); *In re United States*, 872 F.2d 472, 476 (D.C. Cir. 1989). It does not appear that the government's assertion of the state secrets privilege will prohibit these claims from continuing before the Court, as these agreements do not involve privileged information and do not require Plaintiff to prove what the Defendants did for the government.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [doc. #289] is **GRANTED in part** and **DENIED in part.** It is **GRANTED** as to Counts 2 and 5 of Plaintiff's Second Amended Complaint, in which Plaintiff seeks to recover for the misappropriation of trade secrets. It is also **GRANTED** as to all of Plaintiff's claims of breach of contract except that it is **DENIED** for Plaintiff's claims that Defendants disclosed information and design knowledge to Unique Tool and that Defendants did not only make Crater Couplers at their facility in Whippany, New Jersey.

Dated this 28th Day of December, 2007.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

PDF created with FinePrint pdfFactory trial version www.pdffactory.com